**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

DAVID C. WITTIG and DOUGLAS
T. LAKE,

     Defendants-Appellants.

No. 08-3220

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 5:03-CR-40142-JAR-1)**

---

Maxwell Carr-Howard, Husch Blackwell Sanders LLP, Kansas City, Missouri
(Patrick A. McInerney and Lyndsey J. Conrad with him on the briefs) for
Defendant-Appellant Douglas T. Lake.

Jeffrey D. Morris, Jeremy S. Weis, and Christina Birgensmith, Berkowitz Oliver
Williams Shaw & Eisenbrandt LLP, Kansas City, Missouri; and Paula M.
Junghans, Zuckerman Spaeder, Washington, D.C., for Defendant-Appellant David
C. Wittig.

Richard L. Hathaway, Senior Litigation Counsel, United States Attorney's Office,
Topeka, Kansas (Marietta Parker, Acting United States Attorney, and Christine E.
Kenney, Assistant United States Attorney, with him on the brief) for Plaintiff-
Appellee.

---

Before **MURPHY, McKAY,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

David Wittig and Douglas Lake continue to labor under an indictment for allegedly looting their former company, Westar Energy, Inc. Their first trial ended in a hung jury. A second trial yielded convictions, but we reversed those convictions on appeal. With respect to the substantive counts of wire fraud and money laundering, we held that the government had failed to produce sufficient evidence (actually, *any* evidence) of an essential element. We therefore ordered the defendants acquitted of those offenses. The government's error on the substantive wire fraud counts, we found, also implicated the adequacy of the instructions given the jury on the remaining charges against the defendants: circumvention of internal controls and conspiracy. Accordingly, we reversed the defendants' convictions on those counts as well, but because the basis of our reversal had nothing to do with the sufficiency of the evidence, we remanded the case for a possible retrial.

On remand, the defendants argued that any further trial on the conspiracy charges should be barred by the Fifth Amendment's Double Jeopardy Clause; alternatively, and at the least, they argued that the district court should restrict the government's proof at any new trial to avoid double jeopardy problems. The district court denied the defendants' requests, and they responded with this interlocutory appeal. To the extent that the defendants' appeal seeks to anticipate and restrict the evidence the government may produce at trial, however, we have

no jurisdiction to hear their arguments at this stage. In an interlocutory proceeding, we can only vindicate, as a matter of law, the double jeopardy right not to be tried for a second time on the same charge; we have no power to issue orders *in limine* forbidding the admission of this or that piece of evidence or testimony in some potential future trial. To the extent that the defendants do seek dismissal of the conspiracy charges against them, we hold, consistent with our last ruling and the district court's judgment, that double jeopardy doesn't categorically foreclose a new trial because the conspiracy charges in the indictment are considerably broader in scope than the wire fraud charges on which defendants were acquitted. At the same time, we readily acknowledge that today's opinion may not represent the last word on double jeopardy in this case. If, as the defendants predict, the government's proof of conspiracy at trial is narrower than its indictment and seeks to rehash only matters on which the defendants have already been acquitted, more will remain to be said. But all that depends on a guess about the future, and the future must be left to the future. For the present, we are obliged to affirm.

I

The facts underlying this prosecution are set out extensively in *United States v. Lake*, 472 F.3d 1247 (10th Cir. 2007). For our purposes in this appeal, it is necessary to rehearse only part of the story.

A

Over a decade ago, in 1995, David Wittig left a New York investment bank to join Kansas's largest public utility, Westar Energy, Inc., as an executive in charge of corporate strategy. In that role, he developed a plan to diversify Westar's assets by acquiring various unregulated businesses. Westar initially attempted to acquire ADT, a national home-security company. While the acquisition ultimately didn't pan out, Westar still did well, making some $856 million trading in ADT stock. Later, Westar successfully acquired Protection One, another home-security company, and bought stock in Guardian International, a security-alarm business. At least initially, this diversification strategy was hugely successful, adding billions to Westar's net assets and driving its stock price up dramatically, as high as $48 per share in 1998. In early 1999, Mr. Wittig was elected President, CEO, and Chairman of Westar's Board. Around the same time, Douglas Lake, also a New York banker, joined the company as Executive Vice President and Chief Strategic Officer.

Then Westar's health took a turn for the worse. Westar's new subsidiary, Protection One, suffered accounting irregularities and became the subject of an SEC investigation. Its stock price, along with that of its parent Westar, fell sharply. In an effort to staunch the bleeding, Westar split off its public utility from its unregulated businesses and attempted to merge it with another entity (the "Split-Merge Transaction"). But in 2001, the Kansas Corporation Commission

blocked the merger and (rather than approving Westar's pending request for a rate increase) ordered Westar to cut utility rates by $20 million. As a result, Westar's share price plummeted to $9 a share by the end of 2002, around the time Messrs. Wittig and Lake left the company.

In 2004, the United States Attorney for the District of Kansas obtained a forty-count indictment against the defendants. The indictment alleges that the defendants were not just unskilled or unlucky corporate managers, but criminals. According to the government, Mr. Wittig and Mr. Lake conceived and executed a wide-ranging scheme to loot Westar for their own benefit. In particular, the government alleges that the defendants' real motivation behind the Split-Merge Transaction was to collect millions in compensation that it says would be owed them under change-in-control provisions in their contracts had the merger gone through. Other components of the alleged scheme include profiting from complicated transactions in shares of Guardian International that resulted in a $4.2 million loss to Westar, as well as:

> acceleration of a $5.37 million signing bonus to Mr. Wittig that was to have been paid over a 10-year period beginning in 2010; improper payment of relocation expenses; improper loans from Westar; acquisition of a split-dollar life-insurance contract at far greater cost to Westar than the bonus it was ostensibly to replace; and personal use of Westar aircraft. To accomplish this looting, the defendants misled the Board of Directors and connived to remove two Board members who asked challenging questions (the two resigned voluntarily).

*Lake*, 472 F.3d at 1252. The indictment charges seven counts of wire fraud, 18 U.S.C. § 1343; seventeen counts of laundering the proceeds of the wire fraud; 18 U.S.C. § 1957, fourteen counts of circumvention of internal controls (by failing to disclose use of corporate aircraft on internal Westar reports and obstructing company investigations of aircraft use), 15 U.S.C. §§ 78m(b)(5) & 78ff; and one count of conspiracy to commit the three substantive offenses of wire fraud, money laundering, and circumvention, 18 U.S.C. § 371. The fortieth count seeks forfeiture of all assets acquired through the conspiracy, wire fraud, and money laundering. 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); *see also* Appendix (Indictment).

The defendants' first trial on this indictment ended in a hung jury. *See United States v. Wittig*, 425 F. Supp.2d 1196, 1204 (D. Kan. 2006). Six months later, the government retried the defendants. This time, the jury convicted Mr. Wittig on all counts and Mr. Lake on thirty counts. It also found that some, but not all, of the assets listed in count 40 should be forfeited. The defendants then appealed to us, seeking a judgment of acquittal on the substantive offenses (but not on the conspiracy charge, *Lake*, 472 F.3d at 1263-64) because, they alleged, insufficient evidence supported the jury's verdict.

B

We reversed. With respect to the wire fraud and money laundering charges, we concluded that the government failed to produce sufficient evidence

to sustain the convictions. As we explained, the difficulty for the government was that defrauding one's employer does not itself violate federal law. Wire fraud requires the government to establish three elements beyond a reasonable doubt: "(1) a scheme to defraud; (2) an interstate wire communication; and (3) a purpose to use the wire communication to execute the scheme." *Lake*, 472 F.3d at 1255; *United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998). This last element the government failed to prove. The only interstate wires charged in the wire fraud counts of the indictment were four 10-K Annual Reports and three 14A Proxy Statements submitted by Westar to the Securities and Exchange Commission during the defendants' tenure (the "SEC Reports"). The government's sole allegation concerning these reports was that the defendants failed to disclose, as compensation, the value of their personal use of corporate aircraft.

But under the rule in *Parr v. United States*, 363 U.S. 370 (1960), mailings (or, in this case, wires) cannot be for the purpose of executing a fraud when they are made only in response to an "imperative command of duty imposed by . . . law," unless they are also false or fraudulent. *Id.* at 391; *accord Lake*, 472 F.3d at 1256. It was undisputed that the SEC Reports are just that kind of wire: filings that federal law commands must be sent to the SEC. *Lake*, 472 F.3d at 1252. And there was no evidence that the SEC Reports were anything other than truthful. The version of SEC Regulation S-K in force at the time required

disclosure of an officer's perquisites, of which personal use of a company jet is one, only if their collective value exceeds "the lesser of either $50,000 or 10% of the total of annual salary and bonus reported for the named executive officer." *Lake*, 472 F.3d at 1257; 17 C.F.R. § 2298.402(b)(2)(iii)(C)(1) (1999). In this case, the relevant number is $50,000. The regulation provides that "[p]erquisites and other personal benefits shall be valued on the basis of the aggregate incremental cost to the [corporation] and its subsidiaries." *Lake*, 472 F.3d at 1258; 17 C.F.R. § 229.402, Instructions to Item 402(b)(2)(iii)(C). The government introduced no evidence—none—of the aggregate incremental cost to Westar created by the defendants' personal airplane use. Instead, it told the jury all about the *value to the defendants*, as measured by the replacement cost of charting a private jet for each flight on which, for instance, one of the defendants' spouses accompanied them without a business purpose. Calculated this way, the value to each defendant was about $1 million. *Lake*, 472 F.3d at 1253. But this figure was and remains irrelevant to the charge of wire fraud. No matter how high the value to the defendants, the SEC Reports cannot have been false unless the cost to the corporation exceeded $50,000. And because there was no evidence of that, it was impossible to conclude that the reports contained anything "false, fraudulent, or even misleading." *Id.* at 1260. Accordingly, the government had not proven that "a purpose of submitting the reports was in any fashion to further

the alleged fraudulent scheme.  The reports (which, for all we can tell, were correct) were filed because they had to be." *Id.*

We therefore reversed the defendants' convictions for wire fraud for lack of sufficient evidence.  *Id.*  And because it is impossible to be guilty of money laundering unless the "[allegedly laundered] property is, in fact, derived from specified unlawful activity," *id.* (quoting *United States v. Dazey*, 403 F.3d 1147, 1163 (10th Cir. 2005)), the failure of the wire fraud counts was also fatal to the money laundering charges.   A reversal for lack of evidence terminates jeopardy, so retrial on these counts was barred by the Double Jeopardy Clause.  *Id.*; *see also Burks v. United States*, 437 U.S. 1, 18 (1978).

We further concluded that the government's misunderstanding of the nature of the defendants' reporting obligations infected the jury's instructions on the other two charges:  circumvention of internal controls and conspiracy.  With respect to circumvention, the government alleged that the defendants, as part of an ongoing effort to prevent public reporting of their activities, failed to disclose their private use of aircraft on Westar's internal Director & Officer Reports ("D&O Reports") and used their authority to forbid an internal audit of company aircraft use.  It was undisputed that the defendants were required to list their aircraft use on the D&O Reports but did not; the only issue at trial was whether they possessed the necessary intent to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify [a

qualifying corporate record]." *Lake*, 472 F.3d at 1261 (quoting 15 U.S.C. § 78m(b)(5)). And this question of intent boiled down to whether the aircraft use was a material fact. At trial, the government argued that the value to the defendants of aircraft use was so high that they must have thought it was a material fact. But that overlooked the very real possibility that, because the relevant test for SEC reporting is cost to the corporation rather than value to the officer, the defendants omitted their aircraft use because they knew its cost to Westar was beneath the SEC's reporting requirement, and therefore not a material fact. The jury was never instructed on the cost-to-the-corporation test, making it impossible to evaluate the defendants' intent fairly. In order to assess whether the defendants *thought* their aircraft use was material, the jury needed to know whether it actually *was* material. The same problem obtained with respect to the conspiracy convictions. We found that "[t]he jury could not accurately evaluate the conspiracy allegations without being informed regarding what was required to be in the SEC filings." *Id.* at 1263. Finding the jury instructions faulty, but not that the evidence against them was necessarily insufficient to sustain the defendants' convictions, we reversed these counts and remanded them without prejudice to a new trial. Because no convictions remained by this point to support the forfeiture count, we reversed it as well and remanded it for a new trial as well.

On remand, the government expressed its intent to pursue a third trial on the charges that remain: the substantive offenses of circumvention and conspiracy, the latter of which really encompasses three possible theories—conspiracy to commit wire fraud, conspiracy to commit money laundering, and conspiracy to commit circumvention of internal controls. The government also sought again to pursue forfeiture of assets. The defendants responded with a motion to dismiss, raising several challenges to the proposed trial, all based in one way or another on the Double Jeopardy Clause of the Fifth Amendment. Chiefly, they claimed that double jeopardy's collateral estoppel component bars their trial for conspiracy. They also sought to preclude the government from seeking forfeiture of those assets the previous jury found non-forfeitable and to restrict the evidence the government may introduce about when their alleged conspiracy began. In all, the substantive offense of circumvention was the only charge on which the defendants did not seek dismissal. The district court denied the defendants' motion, and this interlocutory appeal followed.

II

A

Our jurisdiction to entertain the defendants' interlocutory appeal is based on, and limited by, the collateral order exception to the final judgment rule. We normally hear appeals only from final judgments terminating proceedings before the district court. 28 U.S.C. § 1291. But in *Cohen v. Beneficial Life Ins. Co.*, 337

U.S. 541, 546-47 (1949), the Supreme Court recognized that an otherwise interlocutory order qualifies as an effectively "final" one when it (1) finally decides (2) a question collateral to the merits of the underlying proceeding, and (3) the decision involves an important right that would be "lost, probably irreparably" if appellate review were deferred to the end of the case.

A motion to dismiss charges in an indictment because of double jeopardy is such an order. *Abney v. United States*, 431 U.S. 651, 659-61 (1977). The right at stake in a double jeopardy claim is independent of the merits of the underlying charges; it is the right not to be "subjected to the hazards of trial and possible conviction more than once for an alleged offense." *Green v. United States*, 355 U.S. 184, 187 (1957). This right is irretrievably lost if the district court denies a motion to dismiss and the defendants proceed to trial. *Abney*, 431 U.S. at 660-61; *United States v. Wood*, 950 F.2d 638, 642 (10th Cir. 1991) (per curiam). We therefore have jurisdiction to hear this appeal to the extent it seeks to vindicate the double jeopardy right not to be tried.

But that isn't the end of the matter. Two limits on our interlocutory jurisdiction also bear on this appeal. First, we are not authorized to review other grounds for dismissal besides the Double Jeopardy Clause. *Abney*, 431 U.S. at 662-63 ("[Jurisdiction] do[es] not extend beyond the claim of former jeopardy and encompass other claims presented to . . . the district court in passing on the accused's motion to dismiss."). In other words, we have no "pendent" appellate

- 12 -

jurisdiction. Rather, every issue presented on appeal must itself "fall within *Cohen*'s collateral-order exception." *Id.* at 663.

Second, we are not authorized to award other relief besides dismissal. While *Abney* tells us we can review "a pretrial order denying a motion to *dismiss* an indictment on double jeopardy grounds," *id.* at 662 (emphasis supplied), it does not confer authority on us to pass on the admissibility of evidence not yet presented. This principle is of particular relevance to this case because the defendants' challenge arises out of the collateral estoppel prong of the Double Jeopardy Clause. *See Ashe v. Swenson*, 397 U.S. 436, 445 (1970). Collateral estoppel precludes relitigation not only of ultimate issues already determined by a final judgment between the same parties. *Id.* at 443. The doctrine is also sometimes deployed in criminal cases to do something *other* than dismiss an indictment. Sometimes, a defendant will argue that collateral estoppel requires suppression of particular pieces of evidence, or the striking of a specific overt act alleged in an indictment, because introduction of such evidence to prove the charges will trench on a previous judgment of acquittal. We have, however, no interlocutory appellate jurisdiction to review the district court's disposition of the latter sorts of arguments. Our jurisdiction extends only to vindicate the right not to be tried at all, not the right to be tried in a particular way.

Put differently, we have no jurisdiction over collateral estoppel arguments that "would merely restrict proof but not make conviction impossible." *United*

- 13 -

*States v. Head*, 697 F.2d 1200, 1205 (4th Cir. 1982); *see also United States v. Powell*, 632 F.2d 754, 758 (9th Cir. 1980) (no jurisdiction to review motion to strike overt acts from indictment); *United States v. Mock*, 604 F.2d 336, 340 (5th Cir. 1979) (no jurisdiction over motion to suppress evidence).  A defendant who seeks to use collateral estoppel to restrict the proof the government might seek to use must "stand trial, object to the evidence and then raise the issue on appeal following conviction."  *Santamaria v. Horsley*, 133 F.3d 1242, 1250 (9th Cir. 1998) (en banc) (Kozinski, J., concurring).

B

These principles require us to dismiss two of the defendants' challenges.  First, the defendants claim that collateral estoppel bars the government from seeking to prove that their conspiracy began in 1995, before the dates of certain specific acts of wire fraud for which Mr. Lake was acquitted in the last trial.  On its face, this is merely an effort to restrict the government's proof at trial.  Even if the argument is correct (and we do not pass on its merits), it would not entitle the defendants to dismissal of any charge.

Second, we must dismiss as well the defendants' challenge to the forfeiture count.  At the last trial, the jury found that some of the assets the government wished to seize were not traceable to criminal conduct, and the government did not appeal.  Both parties before us misunderstand the legal consequences of the government's failure to appeal that verdict.  The defendants argue that double

jeopardy now bars their retrial for forfeiture of those assets. The government, remarkably, believes that because we reversed the jury's *other* forfeiture findings (that is, those allowing seizure), *all* of the jury's findings are deprived of their preclusive effect because the district court's "judgment" was reversed. Appellee's Br. at 45.

Neither of these descriptions is correct. Double jeopardy does not apply to the forfeiture findings because forfeiture is a component of a sentence rather than an "offense" for which the defendants were tried. *Monge v. California*, 524 U.S. 721, 730-31 (1998) (sentencing issues do not generally implicate double jeopardy protection); *Libretti v. United States*, 516 U.S. 29, 42 (1995) (forfeiture is part of a sentence). As for the government's theory that issue preclusion can never apply when some other party successfully appeals some other issue in the same case, we have our doubts. *See In re Scrivner*, 535 F.3d 1258, 1266 (10th Cir. 2008); *In re Albrecht*, 233 F.3d 1258, 1261 (10th Cir. 2000) (noting doctrine of direct estoppel). At a minimum, there remains a colorable question whether the jury's findings are now the law of the case because the government failed to appeal them. *See In re Scrivner*, 535 F.3d at 1266; *Palmer v. Kelly*, 17 F.3d 1490, 1495 (D.C. Cir. 1994). But either way, we have no jurisdiction to decide this now. Neither issue preclusion nor the law of the case doctrine implicates rights collateral to the merits of the underlying proceeding; rather, they are defenses

on the merits that should be resolved by the district court in the first instance, subject to appeal at the end of the case.

The government also asks us to dismiss the defendants' remaining and principal argument that they are entitled to dismissal of the conspiracy charges. The government argues that we lack jurisdiction over this part of the defendants' appeal because dismissal of the conspiracy charge would still leave the necessity of a trial on the substantive circumvention counts (which the defendants have not moved to dismiss). In the government's view, then, even if this appeal is successful, it will still fail to vindicate the right not to be tried. Mot. to Dismiss Appeal at 11-12. This argument is wrong. The Double Jeopardy Clause speaks of being twice in peril for the same "offense," not on the same indictment. Its protections may not be defeated merely by adding additional offenses to the charges. A defendant may no more be subjected to two trials on a single count than on an indictment comprising many counts. *United States v. Ginyard*, 511 F.3d 203, 208 (D.C. Cir. 2008); *see also United States v. Tom*, 787 F.2d 65, 68 (2d Cir. 1986) (interlocutory appeal available in challenge to single count of indictment); *Head*, 697 F.2d at 1206 n.9 (same).

Alternatively, the government suggests that we should dismiss the defendants' appeal under our supervisory power, pursuant to which we may "establish summary procedures and calendars to weed out frivolous claims of former jeopardy." *Abney*, 431 U.S. at 662 n.8. This argument, too, is misplaced.

The defendants' principal double jeopardy claim is not frivolous; in the end, it may even prove correct. As we will explain, all we decide today is that the argument does not entitle defendants to dismissal *at this time*. The district court, or this court in a later appeal, may well uphold the defendants' double jeopardy argument when all the facts are in.

Finally, the government also briefly argues that the defendants' challenge to the conspiracy charges is foreclosed by our opinion in *Lake*. Absent certain exceptional circumstances, we of course adhere to our prior resolution of particular issues as the law of the case. *In re Antrobus*, 563 F.3d 1092, 1098 (10th Cir. 2009) (per curiam). But the law of the case doctrine does not apply unless an issue has been actually decided, "either explicitly or by necessary implication." *Copart, Inc. v. Administrative Review Bd.*, 495 F.3d 1197, 1201 (10th Cir. 2007) (quotation marks omitted); *see also Quern v. Jordan*, 440 U.S. 332, 347 n.18 (1979). The defendants' current double jeopardy arguments were not before the *Lake* panel and thus were not explicitly ruled on. Indeed, the *Lake* court expressly declined to consider any double jeopardy challenge to a retrial for conspiracy. *Lake*, 472 F.3d at 1263-64. The law of the case does not extend to issues a previous court declines to decide. *See generally* 18B Charles Alan Wright et al., Fed. Prac. & Proc. § 4478 (2d ed. 2002). Neither has the government sought to suggest that the defendants unduly delayed or waived their arguments in this appeal by raising questions about the double jeopardy

implications of their acquittals for the first time on remand. Accordingly, we proceed to the merits of the defendants' motion to dismiss.

## III

Double jeopardy "protects a man who has been acquitted from having to 'run the gantlet' a second time." *Ashe*, 397 U.S. at 446 (quoting *Green*, 335 U.S. at 190). Included among double jeopardy's protections is the doctrine of collateral estoppel. *Id.* at 445; *see also United States v. Oppenheimer*, 242 U.S. 85, 88 (1916) (recognizing criminal collateral estoppel). Collateral estoppel is a principle of finality. It means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. To apply the doctrine here, we must ask two questions: First, is the issue the defendants wish to foreclose from trial the actual basis for their prior acquittal? Second, is the same issue necessary to the prosecution's case in this proceeding? *See id.* at 444-45. If both questions yield affirmative answers, collateral estoppel bars retrial of the issue.[1]

---

[1] The second part of the test will only be met if the fact must be proved beyond a reasonable doubt in the new trial; if the issue is subject to a lower standard of proof, the government is not precluded from relitigating it. *Dowling v. United States*, 493 U.S. 342, 349 (1990).

A

The first step of the analysis is easy to perform in this case. Though normally the more elusive inquiry of the two—owing to the vagaries of general jury verdicts—the reason for the defendants' acquittal on the substantive wire fraud charges in this case is easily discerned from our opinion in *Lake*. There, we explained that the government failed to introduce any evidence that the value of the defendants' personal use of Westar aircraft—measured correctly by the marginal cost imposed on the corporation by such use—exceeded $50,000. Accordingly, there was no evidence that the SEC Reports were false. Without that evidence, the government could not establish that the reports were "for the purpose of executing" a scheme to defraud; instead, they are conclusively presumed to have been for the purpose of executing the command of our securities laws that accurate reports be filed.

B

Turning to the second step, we must ask whether this same issue must be relitigated in order to convict the defendants of the conspiracy charges against them. In what follows we consider this question with respect to each of the three species of conspiracy alleged in the indictment: conspiracy to commit wire fraud, money laundering, and circumvention of internal controls.

- 19 -

We begin with conspiracy to commit wire fraud. To win a conviction for this offense, the government has to prove several things.[2] But one thing the government doesn't have to do is relitigate the value of the defendants' airplane use or anything else about the SEC Reports. While the substantive wire fraud counts in the indictment were limited to allegations about the defendants' airplane use and the wires used to report that use to the SEC, *see* Appendix at 17 (First Superseding Indictment counts 16-22), the conspiracy count (count 1) describes a much wider ranging fraudulent scheme to cheat Westar out of money and its intangible right to honest services by any number of means. The conspiracy count contains fully twenty paragraphs alleging overt acts committed by the defendants in furtherance of the conspiracy; only one of these paragraphs pertains to the use of corporate aircraft. For example, the indictment alleges that, as part of their conspiracy, the defendants abused Westar's relocation reimbursement program, Appendix at 9, plotted to remove corporate directors that were critical of them, *id.* at 10, pushed for the Split Merge-Transaction to enrich themselves

---

[2] In particular, it must show that: "(1) the defendant entered into an agreement; (2) the agreement involved a violation of the law; (3) one of the members of the conspiracy committed an overt act; (4) the overt act was in furtherance of the conspiracy's object; and (5) the defendant willfully entered the conspiracy." *United States v. Weidner*, 437 F.3d 1023, 1033 (10th Cir. 2006). Further, "a conspiracy conviction requires 'at least the degree of criminal intent necessary for the substantive offense itself.'" *Id.* (quoting *United States v. Morehead*, 959 F.2d 1489, 1500 (10th Cir. 1992)).

rather than Westar, *id.* at 14, and "subvert[ed] the Board's direction to reduce executive compensation" by collecting pay for serving on the board of Westar's subsidiary, Protection One, *id.* at 11.

Whether the government actually has evidence to support any of these allegations, or whether any of this conduct was actually unlawful, are matters that will surely be tested at trial. At this stage, the question before us is limited to whether, under the indictment as drawn and viewing the matter "with realism and rationality" rather than "with the hypertechnical and archaic approach of a 19th century pleading book," *Ashe*, 397 U.S. at 444, the government could establish that defendants engaged in a conspiracy to commit wire fraud without relitigating the same issue on which they were acquitted in the substantive wire fraud counts. Because the allegations of a conspiracy to commit wire fraud contained in the indictment encompass a great deal more putatively unlawful conduct than the substantive wire fraud counts do, the answer to this question is unavoidably yes.

The defendants point out that the indictment contains no mention of specific wires used by the conspirators other than those associated with the SEC Reports and mentioned in the substantive wire fraud counts. But to secure a conviction even on a substantive wire fraud charge, the Supreme Court has explained that a defendant need not specifically intend the use of this or that wire; the requirement is satisfied "[w]here [he] does an act with knowledge that the use of the [wires] will follow in the ordinary course of business, or where such use

- 21 -

can reasonably be foreseen, even though not actually intended." *Pereira v. United States*, 347 U.S. 1, 8-9 (1954). Here, of course, the conspiracy count extends well beyond the airplane issue and associated SEC Reports. To make out its conspiracy claim, then, the government need only show that, in furtherance of some aspect of this broader conspiracy, the use of the wires followed in the ordinary course of business or was reasonably foreseeable. Reliance on the particular wires associated with the airplane business and SEC Reports and charged in the substantive wire fraud counts is not necessary.[3]

The principal authorities on which the defendants rely—*Sealfon v. United States*, 332 U.S. 575 (1948), and *United States v. Ohayon*, 483 F.3d 1281 (11th Cir. 2007)—are distinguishable precisely because the conspiracy alleged in those cases did not cover conduct beyond that alleged in the underlying substantive counts. While recognizing that a conspiracy count is separate from the underlying substantive offense (so the mere fact of acquittal on one charge does

---

[3] While *Pereira* arose in the mail fraud context, interpretations of the mail fraud statute are, of course, authoritative on questions of wire fraud, *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005), and we ourselves have previously held it sufficient for wire fraud that a defendant "participated in devising the scheme to defraud in which use of interstate wires foreseeably would follow," *United States v. Puckett*, 692 F.2d 663, 669 (10th Cir. 1982). Further, though Judge Learned Hand thought otherwise, *see United States v. Crimmins*, 123 F.2d 271 (2d Cir. 1941), the Supreme Court has explained that the government need not prove a higher degree of criminal intent respecting a jurisdictional element (here, use of interstate wires) in order to establish conspiracy than is required for the underlying substantive offense, *United States v. Feola*, 420 U.S. 671 (1975); *see also United States v. Reed*, 721 F.2d 1059, 1061 (6th Cir. 1983).

not automatically bar prosecution for the other), *United States v. Felix*, 503 U.S. 378, 391 (1992); *see also United States v. Yearwood*, 518 F.3d 220, 227 (4th Cir. 2008), these cases noted that, on their peculiar facts, the alleged conspiracy did no more than track the substantive underlying fraud, such that any effort to prove one offense would, as a practical matter, implicate an issue needed to prove the other.

In *Sealfon*, the Supreme Court held that acquittal for conspiracy to commit fraud collaterally estopped the government from pursuing the substantive fraud itself because, under the operative indictment in that case, "the core of the prosecutor's case was in each case the same." 332 U.S. at 580. The indictment alleged that Sealfon had conspired with his co-defendant, Greenberg, to defraud the United States. The only real evidence of Sealfon's participation in the alleged conspiracy was a letter Sealfon had written to a government agency containing some false representations. *Id.* at 567-77. But the jury acquitted him of conspiracy, and the Court concluded this was a finding that the letter was not written and sent "pursuant to an agreement with Greenberg to defraud." *Id.* at 580. When the government then turned around and tried Sealfon for *substantive* fraud on an aiding and abetting theory, the gist of its case was the same: the defendant aided and abetted Greenberg by sending the false letter. As the Court observed, that was just another way of rephrasing the same thing the government failed to prove the first time; practically speaking, "[Sealfon] could be convicted

of either offense only on proof that he wrote the letter pursuant to an agreement with Greenberg. Under the evidence introduced, [Sealfon] could have aided and abetted Greenberg in no other way." *Id.*; *see also id.* ("[Retrial] was a second attempt to prove the agreement which at each trial was crucial to the prosecution's case and which was necessarily adjudicated in the former trial to be non-existent.").

*Ohayon* is similar. In that case, the defendant was originally charged with the attempted distribution of drugs. But the jury acquitted him for the reason that he did not know the bags in his possession contained drugs. *Ohayon*, 483 F.3d at 1287. The Eleventh Circuit concluded that it would be impossible for the government to prove that a defendant who *didn't* know he was carrying drugs was nonetheless "aware of the essential nature" of a drug-distribution conspiracy, which is one of the things the government must prove. *Id.* at 1291; *cf. United States v. Johnson*, 645 F.2d 865, 868 n.2 (10th Cir. 1981) (government must produce sufficient evidence that defendant is aware of conspiracy's general scope).

The point of these cases is that, when the only way the government can prove one of the elements of a conspiracy offense is to prove the same facts decided against it in a prior trial on a substantive offense, collateral estoppel bars the attempt. That circumstance doesn't pertain here. The conspiracy count in this case, unlike the conspiracy counts alleged in *Sealfon* and *Ohayon*, covers a great

deal of conduct not captured by the substantive wire fraud counts. To convict the defendants of the conspiracy to commit wire fraud alleged in this indictment, the government would never have to make mention to the jury of any of the matters (airplanes or the Securities and Exchange Commission) that resulted in the defendants' acquittal on the substantive wire fraud counts after their earlier trial.

Even if this is so, the defendants suggest that the government lacks evidence to back up its broader conspiracy allegations. Whatever the indictment may say, the defendants predict, the government will be forced to rely again on the SEC Reports and airplane use to secure a conviction; it has nothing to back up its allegations of a larger wire fraud conspiracy. Certainly the fact that in the last trial the government relied so heavily on airplanes and SEC Reports to prove its substantive and conspiracy charges, rather than on the many other transactions mentioned in the conspiracy count of the indictment, does make one wonder whether the government really does have any other proof. But at this stage, our interlocutory appellate jurisdiction limits us to asking whether the crime charged in the indictment *requires* proof of the issue conclusively decided in *Lake*, and cannot be focused on the admissibility of this or that piece of evidence. Given the relative breadth of the conspiracy allegations compared with the wire fraud counts in this case, we cannot say a retrial is legally impossible.

Finally, the defendants argue that, even supposing the indictment's conspiracy charges are broader than the substantive wire fraud counts, the

government should still be barred from proceeding. This argument is based on a particular reading of a Sixth Circuit case, *Saylor v. Cornelius*, 845 F.2d 1401 (6th Cir. 1988). In *Saylor*, the defendant was charged with one count of murder, but the indictment contemplated three theories of his liability for the crime: murder as a principal, as an accomplice, and by conspiracy. *Id.* at 1402. For whatever reason, only the conspiracy theory was charged to the jury; the instructions omitted the other theories, and the prosecution registered no objection. *Id.* When the resulting conviction based on conspiracy was reversed for insufficient evidence, the government then sought to try the defendant again, this time on a theory of accomplice liability. *Id.* at 1403. The Sixth Circuit held that this violated the Double Jeopardy Clause. *Id.* Jeopardy with respect to the accomplice liability theory terminated when the jury returned its verdict, even though it was not instructed on that theory. Otherwise, the court said, "the prosecution could proceed on several theories of liability through a trial, and, simply by withholding instructions on any one of them, reserve that theory for retrial at a later date." *Id.* at 1404. *But see United States v. Davis*, 873 F.2d 900, 904-05 (6th Cir. 1989) (retreating from *Saylor*); *State v. Wright*, 127 P.3d 742, 746-47 (Wash. App. 2006) (criticizing *Saylor* as unpersuasive).

Messrs. Wittig and Lake urge us to adopt *Saylor* and read it as barring the government from pursuing them for conspiracy on any other "theory" of the case besides the one the government pursued at the last trial involving the SEC

Reports and airplanes. Because this expansive view of *Saylor* and the Double Jeopardy Clause is inconsistent with the Supreme Court's guidance, however, we cannot oblige them. In *Richardson v. United States*, 468 U.S. 317 (1984), the defendant sought, after a mistrial declaration, to preclude his retrial on the basis that insufficient evidence was presented to show his guilt in the first proceeding. The Court rejected this argument, explaining that "a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. . . . Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial." *Id.* at 326. Put differently, double jeopardy cannot be an available basis for relief when the original jeopardy has not yet terminated.

In our case, the conspiracy count, reversed for instructional error, was effectively mistried. As such, jeopardy has not yet terminated and there is no double jeopardy bar to retrial on the indictment as presented by the grand jury; questions about the sufficiency of the government's proof must await the new trial's results. Neither can the fact that the government may not have produced sufficient evidence of a particular *theory* at the defendants' earlier mistrial in this case have any more legal significance than the government's failure to produce sufficient evidence of an entire *crime* did in the mistrial at issue in *Richardson*. Until jeopardy terminates, the government is free to pursue any theory of the

crime available to it under the indictment so long as that theory is not barred for some other reason (such as collateral estoppel).

Our conclusion parallels the Fifth Circuit holding in *United States v. Miller*, 952 F.2d 866 (5th Cir. 1992). *Miller* involved two defendants whose convictions for mail fraud were reversed on appeal for instructional error (thus, as here, effectively mistried). The defendants argued, as here, that double jeopardy barred the government from retrying them on a *new* theory of the crime. Recognizing that *Richardson* foreclosed this argument, the Fifth Circuit explained that, because jeopardy had not terminated by virtue of the reversal for instructional error, it was of no moment that the government had not produced, at the first trial, sufficient evidence of the mail fraud theory it wished to pursue at a new trial. "The central concept of *Richardson* is that there is no double jeopardy unless the original jeopardy has terminated; and it is abundantly clear that a reversal for instructional error is no more a termination of jeopardy than a mistrial where the jury is unable to agree." *Id*. at 872 (emphasis supplied).

Having said all this, we recognize that *Saylor* may still have a persuasive application, if a more limited one than the defendants suggest. The Eighth Circuit has suggested that *Saylor* should apply to bar retrial when the earlier mistrial "terminates without a determination of guilt or innocence on a charge as a result of a deliberate, tactical decision by the prosecution." *United States v. Cavanaugh*, 948 F.2d 405, 416 (8th Cir. 1991). Such a reading—requiring some

deliberate decision on the part of the government—is more consistent with the Supreme Court's cases. While mistrials do not normally terminate jeopardy, the Court has recognized an exception when "governmental conduct . . . is intended to 'goad' the defendant into moving for a mistrial." *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982). So while it is inconsistent with *Richardson* to prohibit the government from changing its theory of the case *just because* a case has mistried, it might be equally consistent with *Kennedy* to prohibit the government from intentionally withholding a theory of liability from the jury in order to get a second chance at proving that theory if things aren't going so well in round one. The difficulty for the defendants in this case is that no allegation of prosecutorial misconduct has been made here, so we need not reach the question.[4]

---

[4] The facts of the Eighth Circuit's *Cavanaugh* case illustrate why this understanding of *Saylor* may be sensible. *Cavanaugh* involved eleven defendants charged with a series of mob assaults leading to murder. There were two separate available theories of the crime: either there was "one continuous criminal act of assault culminating in murder," or else "there were two distinct crimes—murder and a separate felonious assault." *Cavanaugh*, 948 F.2d at 412. At trial, the government exclusively pursued the continuous theory of the crime, and "abandoned" the other theory. *Id.* at 413. The advantage to the government of this approach was that the continuous crime theory was the only way of establishing most of the defendants' liability for the murder. *Id.* at 413. The disadvantage was that, under the continuous theory, the doctrine of merger might bar punishing the attackers for both assault and murder. *Id.* at 412. Consistent with the government's theory, the jury returned murder convictions without passing on assault. *Id.* at 407. But when the murder convictions were later reversed for insufficient evidence, the government suddenly switched theories, and tried to pursue convictions for the "separate" offense of assault. The Eighth Circuit held that double jeopardy barred retrial because "the government's deliberate trial strategy caused the first trial to terminate without the jury passing

(continued...)

Because the government is able to prove a conspiracy to commit wire fraud without running afoul of *Lake*, it follows it can also establish a conspiracy to commit money laundering. The defendants' contrary contention depends on a misunderstanding of the nature of a conspiracy charge. Generally, money laundering is "[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced." Black's Law Dictionary 1027 (7th ed. 2004). When a person is charged with the *substantive* offense of money laundering, the government has to show that the defendant knowingly engaged in a monetary transaction in property that *in fact* was derived from certain kinds of unlawful activity. *United States v. Massey*, 48 F.3d 1560, 1565 (10th Cir. 1995) (quoting 18 U.S.C. § 1957(a)). In other words, you cannot commit money laundering unless there is actually dirty money in need of cleaning. The defendants mistakenly believe that this principle applies to conspiracy charges as well. They contend that, because they were *acquitted* of the substantive offense of wire fraud, that means all the money they obtained from Westar was in fact clean; therefore, they can no more have agreed to launder it than they could have actually laundered it. Put differently, the defendants say

[4](...continued)
on [the assault] charge." *Id.* at 417; *see also id.* (noting that "[t]he prosecution could have presented the original jury with the theory it now wishes to advance.").

that a conspiracy to launder money must take the form: "Let us launder *this* money."

This argument is mistaken. *Agreeing* to obtain illegal proceeds and to launder those proceeds is a criminal money laundering conspiracy. To convict Messrs. Wittig and Lake, the government must prove "(1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006); *see also Wittig*, 568 F. Supp.2d at 1293. In other words, the defendants committed conspiracy if they agreed as follows: "Let us launder the money *we plan to obtain* from our wire fraud scheme." As we explained in the previous section, proving a conspiracy to commit wire fraud does not require relitigation of the SEC Reports and airplane use that formed the basis of the defendants' substantive wire fraud acquittals, and therefore neither does proving that the defendants agreed to take the additional step of laundering ill-gotten gains. The conspiracy to commit money laundering, like the conspiracy to commit wire fraud, could involve any of the many other transactions mentioned in the indictment.

Neither does it follow that, just because the defendants may not have *succeeded* in either committing wire fraud or money laundering, they did not *conspire* to do those things. A conspiracy can fail and still be a crime. *Cf.*

- 31 -

*United States v. Martinelli*, 454 F.3d 1300, 1312 (11th Cir. 2006) ("It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity."). The conspiracy to commit money laundering charge is therefore not barred by the acquittal for wire fraud.

3

Finally, the defendants claim that the conspiracy to commit circumvention of internal controls charge is also barred by collateral estoppel. This challenge is somewhat peculiar because, unlike the other two species of conspiracy we have discussed, the defendants have not been acquitted of the underlying substantive charge of circumvention and they do not challenge the government's continued pursuit of that substantive offense. Additionally, *neither* the substantive circumvention charge nor the conspiracy to commit circumvention charge relies on the falsity of the SEC Reports.

Instead, the central issue on both counts is whether certain internal actions taken by the defendants at Westar—their conceded failure to disclose their airplane use on the D&O Reports and their refusal to permit an audit, *see* Appendix at 15-16 (detailing specific allegations of circumvention)—were taken, or agreed to be taken, to circumvent the system of internal controls. And answering this question about the defendants' *mens rea* does not require the relitigation of decided issues. As we have already noted in *Lake*, the now-

established fact that the defendants' airplane use *did not* need to be reported to the SEC—and that the SEC Reports were therefore truthful—may be highly relevant to the defendants' *mens rea*, but it is not dispositive. *See Lake*, 472 F.3d at 1262. To be sure, it is imperative that the jury be told both that the "only relevant purpose of the [D&O Reports] was to prepare SEC filings," and that the defendants' omission of their aircraft use from these forms "apparently did not cause any errors in the reports to the SEC." *Id.* at 1262. But as we noted in *Lake*, it is at least possible that the defendants may have been operating under a mistake: they may have wrongly believed that their airplane use *was* reportable to the SEC, and therefore deliberately omitted it from the D&O Reports in order to keep it hidden. *Id.* at 1262-63. Or there may be some other reason why the defendants wished to circumvent internal controls. That will be for the government to prove at trial. But because the government *could* prove this conspiracy without disputing that the SEC Reports were *in fact* true, we see no basis for dismissing this charge. The only argument the defendants present for avoiding this result is the one based on *Saylor*: that the government is stuck with the *theory* of circumvention it advanced in the first trial. *See* Appellant's Op. Br. 43-44. For the reasons we gave in Part III.B.1, *supra*, we reject that argument.

\* \* \*

We grant the government's motion to dismiss the defendants' appeal with respect to the forfeiture counts, and with respect to the government's plans to

introduce evidence that the alleged conspiracy began at a particular time.  As for

the rest of the appeal, the government's motion to dismiss under our supervisory

power is denied, and the judgment of the district court is affirmed.

FILED
U.S. DISTRICT COURT
DISTRICT OF KANSAS

2004 JUL 14 P 2: 19

RALPH L. DELOACH
CLERK
BY_____ DEPUTY
AT TOPEKA, KS.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(TOPEKA DOCKET)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  03-40142-01/02-JAR |
| | ) | |
| | ) | Ct. 1:      18 U.S.C. §371 |
| DAVID C. WITTIG   and | ) | Cts.2-15:  15 U.S.C. §78m(b)(5) |
| DOUGLAS T. LAKE, | ) | Cts.16-22: 18 U.S.C. §1343 |
| | ) | Cts.23-39: 18 U.S.C. §1957 |
| Defendants. | ) | Ct. 40:    Forfeiture |
| | ) | |

## FIRST SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

### Introduction

1)      Western Resources, Inc. was originally incorporated in 1924 as a consumer services company. It operates as a public utility under the supervision of the Kansas Corporation Commission ("KCC"), supplying electric service to approximately 640,000 captive residential and commercial customers in Kansas.  In 2001 Western Resources, Inc. was renamed Westar Energy, Inc. (hereinafter referred to as "Westar" or "Company"). The fiscal year end for Westar is December 31. Since at least 1997 Westar has generated more than a $1,000,000,000 in revenues annually.

2)      Because Westar is a utility and a monopoly it is subject to regulation by the KCC, whose mission is to protect the public interest through impartial, and efficient regulation of rates,

service and safety of public utilities.

3) The United States Securities and Exchange Commission ("SEC") is an agency of the United States of America. A primary duty of the SEC is to protect investors and maintain the integrity of the securities markets. Following the stock market crash of 1929, Congress passed laws to create the SEC and to require that investors receive financial and other significant information concerning securities being offered for public sale, and prohibit deceit, misrepresentations, and other fraud in the sale of securities. Congress empowered the SEC with broad authority over all aspects of the securities industry and public companies, including the requirement of filing periodic reports concerning public companies. These reports are available to the public through the SEC's EDGAR database.

4) The Electronic Data Gathering, Analysis and Retrieval system ("EDGAR") was created by the SEC in order to facilitate the electronic submission of, and rapid public access to, documents required to be filed under federal securities laws. Since 1996 all United States public companies have been subject to mandatory electronic filing in the EDGAR system.

5) Westar is a company whose stock is publicly traded on the New York Stock Exchange. As a public company, Westar is required to file periodic reports with the SEC including: the 10-K annual report, the 8-K current report, and the 14A proxy statement. The 10-K annual report is required to be filed after the end of the Company's fiscal year and is the most detailed of the required reports providing a comprehensive description of the Company's business activities, plans, management, and financial conditions. 8-K reports must be filed following important events or changes in the life of the Company such as the resignation of a director from the board of directors.

6)      14A Proxy Statements must be filed with the SEC and must contain a summary compensation table for the chief executive officer of Westar and at least the next four most highly compensated executive officers.

7)      Additionally, the laws, rules and regulations of the SEC require public companies like Westar to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company and require that the Company devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's general or specific authorization, that transactions are recorded as necessary to permit preparation of financial statements, and to maintain accountability for assets.

8)      The Social Security Administration ("SSA") and the Internal Revenue Service ("IRS") are agencies of the United States of America. Westar provides information to these agencies in respect to all income paid, in whatever form, to employees of the Company, which would include the defendants herein, DAVID C. WITTIG and DOUGLAS T. LAKE.

9)      Westar had numerous assets, such as airplanes, which were to be used for conducting the business of the Company and for the benefit of the Company's stockholders and ratepayers. These assets did not exist for the personal gratification and personal enrichment of the Company's management, including defendants WITTIG and LAKE.

10)      Prior to joining Westar, DAVID C. WITTIG ("WITTIG") a defendant herein, was a managing director and investment banker at Salomon Brothers in New York, and has considerable experience with publicly traded companies. WITTIG was the account officer at Salomon for Westar. In 1995 the defendant WITTIG joined Westar as Executive Vice President

of Corporate Strategy. In 1998 WITTIG rose to the position of President, Chief Executive Officer and Chairman of the Board of Directors. In the course of his prior dealings with Westar, WITTIG learned that the Company was in effect a monopoly, enjoying a substantial annual revenue exceeding $1,000,000,000, with a relatively small and manageable debt structure.

11) In 1998, DOUGLAS T. LAKE ("LAKE"), a defendant herein, was hired by WITTIG to join Westar as Executive Vice President of strategic planning. LAKE also became a director of Westar, and was appointed to and served on the boards of several subsidiary and affiliated corporations. LAKE was an investment banker with Bear Stearns in New York and WITTIG and LAKE had previously worked together at Salomon Brothers in New York. LAKE also has considerable experience with publicly traded companies.

12) WITTIG and LAKE, who were both paid substantial compensation by Westar, had a fiduciary duty to the Company and its shareholders to act in the shareholders' best interest, and to conduct the Company's business with candor and honesty, free from self-dealing and conflicts of interest. WITTIG, as President, Chief Executive Officer and Chairman of the Board of Westar, and LAKE, as a member of the Board of Westar, and an executive in charge of the strategic direction of the Company, were in charge of the day-to-day operations of Westar and were in control of substantial assets of the Company that they were required to nurture, grow and safeguard. They had the obligation to ensure that internal controls guarding against the abuse and misuse of these assets were in place and respected. They were required to act fairly and not abuse the authority entrusted to them by the shareholders for personal gain at the expense of the Company. Instead, as set forth with more detail in the Scheme portion of this indictment, WITTIG and LAKE observed weaknesses in these internal controls and oversight by former

management which they exploited for their own personal gratification and enrichment.

13) Personal use of corporate assets are a fringe benefit taxable as ordinary income to employees of a company including such individuals as WITTIG and LAKE, and are required to be reported to the Internal Revenue Service. WITTIG and LAKE concealed and covered up their personal use of corporate aircraft and circumvented the internal controls of Westar causing false reports to be submitted to the SSA, IRS and SEC, agencies of the United States of America.

14) During WITTIG's brief tenure with the Company he managed to extract more than $25,000,000 in compensation and benefits. During LAKE's brief tenure with the Company he managed to extract more than $7,000,000 in compensation and benefits. During this same tenure WITTIG and LAKE presided over a company whose stock prices went from $44.00 per share to less than $9.00 per share, whose debt increased to more than $3,000,000,000, and whose future was poised on the brink of bankruptcy.

15) On July 17, 2002, the United States Attorneys Office for the District of Kansas caused to be served on WITTIG a subpoena of the federal grand jury. This subpoena and WITTIG's subsequent testimony before the grand jury put WITTIG on notice that an inquiry was being undertaken in respect to his line of credit at Capital City Bank in Topeka and his personal use of the corporate aircraft of Westar, an asset of the Company. It was not until after this subpoena that WITTIG and LAKE ever undertook to prepare and put in place a comprehensive internal control procedure to avoid the extravagant personal use of corporate aircraft.

16) On September 17, 2002, the United States Attorneys Office for the District of Kansas issued a subpoena to Westar demanding production of documents and information relating to the use of Westar aircraft. Thereafter, numerous subpoenas followed demanding

information relating to executive compensation, the Company's proposed merger with the Public Service Company of New Mexico and its proposed rights offering for shares of Westar Industries, Inc., as well as other matters.

17) On September 27, 2002, the Board of Westar formed a special committee and hired the law firm of Debevoise & Plimpton, New York, to assist in conducting an internal investigation.

18) On November 22, 2002, WITTIG resigned from the Board and management of Westar and all subsidiaries preserving his right to make claims and seek compensation from the Company. These claims exceed $110,000,000.

19) On December 6, 2002, LAKE resigned from all Boards and management of Westar and all subsidiaries preserving his right to make claims and seek compensation from the Company. These claims exceed $220,000,000.

## THE SCHEME:

20) Beginning with WITTIG's employment at Westar in 1995, WITTIG devised and executed a scheme and artifice to defraud Westar and its shareholders of money, funds, property and assets of the Company and the intangible right to honest services by means of a pattern of material false and fraudulent pretenses, representations, promises and omissions of material fact. Upon LAKE's employment with Westar in 1998, WITTIG and LAKE formed a conspiracy to continue the scheme, as more specifically set out hereinafter.

# THE CONSPIRACY
## IN VIOLATION OF TITLE 18 UNITED STATES CODE, SECTION 371

### Count 1

21)     Commencing in approximately 1998, with the hiring of LAKE, and continuing through at least February of 2004, the defendants herein,

**DAVID C. WITTIG and**
**DOUGLAS T. LAKE,**

in the District of Kansas, and elsewhere, did combine, conspire, confederate and agree to commit offenses against the United States and to defraud the United States and any agency of the United States by:

> A) devising and executing, and attempting to execute, by wire communications, a scheme and artifice to defraud Westar and its shareholders of money, funds, property and assets, and the intangible right to honest services by means of a pattern of material false and fraudulent pretenses, representations, promises and omissions of material fact in violation of Title 18, United States Code, Sections 1343;

> B) circumventing internal controls of Westar designed to account for use and disposition of assets to ensure accurate reporting therefore as required by law, in violation of Title 15, United States Code, Sections 78m(b)(5) & 78ff;

> C) engaging in monetary transactions in property derived from specified unlawful activity in violation of Title 18 United States Code, Section 1957.

22)     It was part of the object of said conspiracy and scheme to defraud that:

> A) WITTIG and LAKE used sophisticated means to deprive Westar and its shareholders of the intangible right to honest services and obtain compensation, bonuses, stock, contractual rights, real and personal tangible and intangible property, including rights, privileges, interests, claims and securities, (including but not limited to reimbursement and advancement of attorneys fees) under false pretenses.

> > i) for WITTIG, the amount of liquidated pecuniary harm and actual and intended loss to Westar and its shareholders is approximately $27,900,000.

ii) for LAKE, the amount of liquidated pecuniary harm and actual and intended loss to Westar and its shareholders is approximately $9,400,000.

B) WITTIG and LAKE perverted corporate programs for their own personal profit.

C) WITTIG and LAKE sought to systematically loot Westar of money and assets.

D) WITTIG and LAKE circumvented internal controls, programs and practices designed to ensure accountability for assets.

E) WITTIG and LAKE sought to consolidate all power and authority in themselves by ridding the Board of outspoken and independent members, reducing the size of the Board when independent members would resign in protest, reducing management, conducting investigations of former employees thought to be contacting the press and KCC, and monitoring the phone calls of employees to identify individuals contacting the press and KCC.

F) WITTIG and LAKE structured a subsidiary, Westar Industries, Inc., to loot assets from the utility and leave debt behind in the utility for ratepayers.

G) WITTIG and LAKE structured employment agreements containing "change in control" provisions that allowed them to dictate the terms and timing under which they leave the Company and reap substantial rewards.

23)     In furtherance and execution of the objects of said conspiracy and scheme to defraud, the defendants and conspirators committed overt acts, including, but not limited to those which follow and the substantive offenses listed hereinafter:

A) CORPORATE AIRCRAFT. Westar kept and maintained up to three corporate aircraft that were assets of the corporation and intended to be used to further the business of Westar and it's subsidiaries. WITTIG and LAKE systematically used the corporate aircraft for their personal benefit, gratification and enrichment and that of their families, falsely reporting the use as being for business in the Company records, and causing false corporate reports, W-2's, and personal and corporate tax returns to be issued and/or filed. By causing the falsification of records WITTIG and LAKE avoided over $750,000 each in compensation being attributed to them for income tax purposes. For example, from July 10 to July 19, 2002, WITTIG used the Company plane to take his family on a ten day vacation to France and England. Throughout LAKE's employment with Westar he used the

Company plane as a shuttle to and from his primary residence in New York and his vacation home in West Palm Beach, Florida. WITTIG and LAKE also obtained a third airplane capable of international travel which they concealed to avoid criticism and had to ultimately sell at a loss to the Company of approximately $1,600,000. In the fall of 2001, the Director of Internal Audit for Westar advised WITTIG that she wanted to audit use of the corporate aircraft. WITTIG forbade her from doing the audit in order to prevent discovery of the extent of personal use of the aircraft by WITTIG and LAKE;

B) RELOCATION PROGRAM. Like many companies, Westar maintained a program to reduce the hardship for relocation of an employee's principle residence at the demand of the Company. During the relevant period in order to prevent the Company from accumulating a substantial inventory of homes, Westar agreed to pay transferring employees 15% of the appraised value of their homes. The benefit was intended to cover all of the employee's relocation costs, including brokerage fees associated with the sale of their residence to encourage the employee to sell their own home. WITTIG caused assets of the Company to be depleted in the amount of $825,000 representing 15% of his $5,500,000 Fifth Avenue condominium in New York, knowing that he had no intention of selling this residence. After WITTIG had been at Westar for a year and had received this $825,000, WITTIG requested reimbursement for lodging costs while he stayed at his New York City condominium. John Hayes, the presiding CEO and Chairman of the Board did not approve this reimbursement.

LAKE caused assets of the Company to be depleted in the amount of $262,000 representing 15% of his $1,700,000 residence in New York, knowing that he had no intention of selling his residence. In fact much of the personal use of the corporate aircraft for LAKE resulted from him using the plane as a shuttle to and from his New York residence and Topeka;

C) ACCELERATION OF SIGNING BONUS. Prior to his employment with Westar, WITTIG negotiated a sign-on bonus for ten annual payments of $537,000 beginning June 1, 2010, or his retirement as an officer of the Company, whichever came first. Without the knowledge or approval of the board, WITTIG caused the bonus to be accelerated and paid as a lump-sum of $5,370,000 in 1999, which was not discounted for the present value of the money;

D) SPLIT-DOLLAR LIFE INSURANCE AGREEMENT. In 1998 Westar envisioned a plan to award insurance policies to six senior officers, including WITTIG. This plan was proposed to the board of directors as a means to defer the bonus the executives were due under the short-term incentive plan. The plan would award a portion of the bonus in cash, and use the balance to make premium payments under split-dollar policies in the form of a loan to the officer with an

assignment of a collateral interest in the policy to the Company as security. The officer would be entitled to make tax-free loans against the cash surrender value of the policy and the Company would make additional premium payments in amounts equal to the officer's tax free loans. When the officer died, the Company would receive a tax-free benefit equal to the cumulative amount of premiums that the Company had paid, and the officer's beneficiary would receive the balance. Additionally, because the portion of the proposed short-term incentive plan bonus that was used for the premium payment would not be counted as a short-term incentive award, and therefore would not be included in the calculation of supplemental executive retirement plan benefits, each officer's split-dollar policy apparently was to be funded by an additional amount representing the net present value of the lost benefits. This plan was intended to cost the company the same amount as paying the short-term incentive plan bonus.

In 1998, WITTIG received a split-dollar agreement from the Company knowing that it varied materially from the program as originally anticipated by the Westar board of directors. The Company paid a premium of $3,445,733, more than twice the short-term incentive bonus to which he was otherwise entitled; required the Company to purchase the policy; and allowed WITTIG to sell ("put right") the policy death benefits back to Westar. WITTIG valued his put right at more than $7,000,000 as of 2001.

E) AMENDMENT TO WITTIG'S SPLIT-DOLLAR LIFE INSURANCE AGREEMENT. On or about June 26, 2002, WITTIG caused Westar's Human Resources Committee of the Board to approve an amendment to his Split-Dollar Insurance Agreement through the pretense that WITTIG could thereby exercise his put rights in small increments when as WITTIG then and there knew he intended to exercise his put rights in large increments. Upon approval of this amendment WITTIG promptly sold or put $4,000,000 of his death benefits to Westar receiving $2,000,000 in cash.

F) USE OF CORPORATE COUNSEL TO ASSIST IN REMOVAL OF DIRECTORS CRITICAL OF MANAGEMENT. As of November 2000, Jane Dresdner Sadaka and Owen Leonard were members of the board of directors of Westar. At a meeting of the board in November of 2000, Sadaka and Leonard voiced objections to the employment agreements and compensation benefits for WITTIG and LAKE. Subsequently, WITTIG and LAKE directed corporate counsel to circulate a chronology of the adoption of the employment agreements, directed corporate counsel to contact Sadaka and Leonard in an effort to pressure them to drop their objections, and directed corporate counsel to attend a meeting requested by Sadaka and Leonard with WITTIG on January 31, 2001, to advise them that the contracts were enforceable. On or about January 23, 2001, when Sadaka and Leonard refused to drop their objections to the employment

agreements, WITTIG and LAKE agreed on a "strategy [to] get Jane/Owen off [the] board." WITTIG and LAKE utilized and caused Westar to pay for corporate counsel in connection with this strategy, which succeeded in eliminating dissenting and independent directors from the board. After eliminating these directors WITTIG and LAKE caused the size of the board to be reduced.

G) USE OF CORPORATE COUNSEL FOR PERSONAL EMPLOYMENT MATTERS. In furtherance of their scheme to use corporate assets for their personal gratification and enrichment, WITTIG and LAKE used and caused the use of Westar counsel to provide legal advice and assistance on personal employment matters pertaining to retention of their compensation. In late 2001, WITTIG and LAKE were tasked with the responsibility for implementing a reduction of their salaries. Instead of pursuing this from the standpoint of what was best for Westar, WITTIG and LAKE approached outside counsel for the Company seeking ways to insure that they would be kept whole for compensation payouts. On our about January 25, 2002, WITTIG and LAKE caused outside counsel to send an e-mail to them enclosing a draft of a resolution protecting WITTIG and LAKE's other compensation and asking whether it could be added to other resolutions or should exist as a freestanding resolution.

H) OBTAINING ADDITIONAL COMPENSATION DESPITE REDUCTION IN SALARIES. In addition to using corporate counsel to advise and assist them on countering reductions to salaries, WITTIG and LAKE effected a scheme to subvert the Board's direction to reduce executive compensation. Protection One is owned 87% by Westar. WITTIG and LAKE caused Protection One to pay them more than $20,000 in director's fees knowing that Company officers serving on the Protection One Board in previous years had not received fees. Additionally, in February of 2002, WITTIG and LAKE caused Protection One to award them 125,000 Protection One options each, knowing that other directors received only 10,000 options.

I) MISUSE OF THE COMPANY LOAN PROGRAM. In 2001 Westar instituted a stock ownership program for executives and provided stock purchase loans for executives to purchase the number of shares necessary to satisfy the minimum stock ownership requirements for grants of restricted stock units. LAKE, who already met the minimum stock requirement abused the program by borrowing $1,000,000 on December 5, 2001. LAKE then used only $300,000 to acquire Company stock and has defaulted under the terms of the loan.

J) MISLEADING WESTAR TO AWARD RESTRICTED SHARE UNITS ("RSU's") AND SHARES OF GUARDIAN INTERNATIONAL, INC. Guardian is a home security monitoring company in Florida, in which Westar,

through a subsidiary, held shares. LAKE served on the Board of Guardian and was intimately familiar with it's financial situation. As of May 2001, Westar owned shares in three different classes of stock of Guardian. In November and December 2001, the Human Resource Committee of Westar was presented with a proposal by WITTIG to issue Guardian restricted share units as long term incentive awards. The approval was the result of affirmative misrepresentations of WITTIG and LAKE. WITTIG and LAKE caused to be represented to the committee that all officers would be offered RSU's in the same series of Guardian preferred stock. WITTIG and LAKE caused officers to be notified that they would be given the option of receiving only Guardian Series D shares while WITTIG and LAKE arranged to receive Guardian Series E and D shares. The Series E shares paid a quarterly cash dividend. Those cash dividends were paid on January 1, 2002. WITTIG and LAKE caused the awards to be effective as of January 1, 2002 in order that they would receive approximately $12,000 in cash dividends. Additionally, WITTIG and LAKE concealed from the Committee the material fact that they intended Westar to acquire Guardian through a subsidiary. A change in control would trigger redemption rights in the Series D and E shares at $1,000 per share, or a substantial premium to the book value of the stock at the time it was awarded by the Committee. In WITTIG's case, upon redemption, stock awarded at a value of approximately $2,793,000 would be redeemed at $6,337,000, for a premium of approximately $3,544,000. In LAKE's case upon redemption, stock awarded at a value of approximately $1,656,000 would be redeemed at $3,772,000 for a premium of approximately $2,116,000.

K) MISLEADING THE HUMAN RESOURCES COMMITTEE AND BOARD OF WESTAR TO AUTHORIZE A RESTRICTED SHARE UNIT EXCHANGE OFFER TO CONVERT PREVIOUSLY AWARDED WESTAR RSU'S INTO UNDERVALUED GUARDIAN SHARES. In April 2002, WITTIG and LAKE rejected an offer by Guardian to redeem Guardian Series C shares as part of a plan to preserve their opportunity to acquire Series C shares of Guardian in an exchange offer. WITTIG and LAKE concealed this rejection. On or about April 16, 2002, WITTIG and LAKE proposed to the Human Resources Committee of the board of Westar an exchange offer in which Westar employees could exchange Westar RSU's for actual shares of Guardian without any vesting requirements. In making the presentation, WITTIG and LAKE concealed the material fact that they were probably the only Westar employees who were eligible to choose Guardian shares in the exchange, and falsely represented that the exchange offer would result in substantial savings for Westar. In fact the exchange offer resulted in an additional $4,200,000 in expense or wasting of assets to Westar on the exchange of WITTIG's and LAKE's RSU's while, WITTIG received Guardian shares realizing a net additional benefit of approximately $6,100,000, and LAKE received shares realizing a net additional benefit of approximately $2,900,000.

L) WITTIG AND LAKE DOUBLE DIP ON GUARDIAN DIVIDENDS. On or about June 24, 2002 WITTIG and LAKE manipulated the timing of the exchange offer of Westar RSU's for Guardian shares in a manner in which they would get second quarter 2002 dividends on both allowing them to "double dip" their investments, concealing this aspect of the exchange offer from the Human Resources Committee of the board of Westar. Through this stock manipulation and deception WITTIG realized dividends in excess of $193,943, and LAKE realized dividends in excess of $99,214;

M) WESTAR INVESTMENT IN QuVIS. As of December 2001, both WITTIG and LAKE had substantial personal investments in QuVis, a technology company based in Topeka, Kansas, that manufactures digital systems to record, edit and play movies and transmit them via satellite. WITTIG's wife also served on the board of QuVis. In December of 2001, without disclosing their personal financial stake in QuVis, WITTIG and LAKE caused Westar to lend $400,000 to QuVis. QuVis ultimately defaulted on the loan.

N) UNDISCLOSED INVESTMENT IN KMF. In April 2000, WITTIG caused Westar to invest $2,000,000 in KMF, a hedge fund in which WITTIG had a $1,000,000 personal investment, concealing his interest in the fund, causing the depletion of more than $1,800,000 in Westar assets.

O) FALSIFICATION OF PROXY STATEMENTS. On our about February 19, 2002, WITTIG caused minutes of the Human Resources Committee to be falsified to avoid reporting on the Westar's Proxy Statement that he had been awarded $267,000 as a short-term incentive bonus for 2001.

P) DEPLETION OF CORPORATE ASSETS BY A LAVISH RENOVATION OF EXECUTIVE OFFICE SUITE. At a time when WITTIG was laying off hundreds of Westar employees and instituting other cost saving measures, WITTIG exploited his capital expenditure authority granted to him for the purpose of plant and facility projects to cause Westar to expend in excess of $6,500,000 to renovate the second floor of Westar's office building at 800 South Kansas Avenue in Topeka into executive suites. This renovation included a gourmet kitchen and dining room, and a 1,000 square foot office for WITTIG equipped with a large bathroom, shower, dressing area and $29,000 custom built television wall unit.

Q) DEPLETION OF ASSETS TO SQUELCH EMPLOYEE CONTACTS WITH MEDIA AND REGULATORS. On or about May 7, 2001, under a program denoted "Project X," WITTIG and LAKE caused Westar to contract with attorneys and The Arkin Group LLC for the purposes of investigating the sources within the Company who were contacting the media and regulators about abuses of Westar by corporate officers. As part of this process, records of employee

phone calls and e-mails were reviewed and the backgrounds of employees, members of the media and regulators of the Company were investigated in an effort to squelch the truth about what was occurring within the Company. This activity depleted corporate assets by at least $100,000.

R) OBTAINING EMPLOYEE VOTING RECORDS. On June 15, 2000, an annual meeting of shareholders of Westar was held in Topeka. On or about June 19, 2000, WITTIG learned that there had been a significant decline in employees voting in favor of management. WITTIG directed a subordinate to obtain information on how individual employees voted their shares. WITTIG utilized this information in making personnel decisions. Following the shareholder meeting in 2001, WITTIG again directed a subordinate to obtain information concerning how the approximately 120 highest paid employees in Westar voted their shares to see if they were supportive of management. This request took place in advance of the reorganization of management in the Company. WITTIG took these actions to create a climate of intimidation and discourage employees from freely exercising their rights to oppose bad management.

S) ATTEMPT TO SPLIT AND MERGE WESTAR FOR THE BENEFIT OF WITTIG AND LAKE. On or about March 2000, WITTIG and LAKE recommended to the Westar Board that management pursue a separation of the regulated utility business and its nonregulated businesses. On May 18, 2000, WITTIG and LAKE caused Westar to publicly announce that Westar would seek such a separation. On November 9, 2000, WITTIG and LAKE caused Westar to announce that it had entered into a merger agreement with Public Service Company of New Mexico. This strategy was always portrayed as one which would increase shareholder value in the Westar utility as well as the spinoff company that was to be called Westar Industries. However, the assets and liabilities were allocated between the utility and Industries such that the utility was left with virtually all of the debt and Industries was structured such that it had nearly $1,450,000,000 in assets and virtually no debt. There was never a full disclosure to the shareholders and the investing public that the greatest beneficiaries of this merger would be WITTIG and LAKE. WITTIG was projected to realize between $37,000,000 and $65,000,000, while LAKE was projected to realize between $18,000,000 and $35,000,000 by virtue of "change-in-control" provisions to which they had manipulated into their employment agreements. Additionally, WITTIG and LAKE at the time of the merger would simply assume top executive and board positions with the non-regulated spin-off corporation, Westar Industries, with new employment agreements and a substantial ownership interest in that corporation.

T) INTENTIONAL OVER-RENOVATION OF THE LANDON MANSION. In addition to the phenomenal benefits that WITTIG and LAKE expected to realize

upon the splitting up of Westar, were additional benefits derived from a provision that they caused to be added to their employment agreements. In September of 2000, WITTIG and LAKE caused to be added to their agreements, without the knowledge and approval of the board, that upon a change in control, the Company would purchase their residences from them at the higher of the appraised value or the purchase price, plus all improvements plus 17%. WITTIG, for example, well knew that his residence has never been appraised at more than $2 million, nonetheless, WITTIG used stock received from WESTAR under false pretenses as collateral for a line of credit at Capital City Bank in Topeka, Kansas. Using this line of credit WITTIG pumped more than $6,000,000 into the Landon Mansion knowing that Westar would have to pay him that much and more upon a change of control in the Company.

## CIRCUMVENTION OF INTERNAL CONTROLS
## IN VIOLATION OF TITLE 15 UNITED STATES CODE, SECTIONS 78m(b)(5) & 78ff

24)     Paragraphs 1 through 23 are incorporated herein by reference.

25)     On or about the dates set forth below, in the District of Kansas, the defendants,

### DAVID C. WITTIG and
### DOUGLAS T. LAKE,

knowingly and wilfully circumvented and knowingly failed to implement a system of internal accounting controls and knowingly and materially falsified and caused to be falsified any book, record and account required to be kept by Westar as an issuer of a security registered pursuant to Title 15, U.S.C. Section 78*l* and required to file reports pursuant to Title 15, U.S.C. Section 78*o*(d):

| Count | On or About Date | Circumvention, Failure of Implementation or Falsification | Book, Record or Account |
|-------|------------------|-----------------------------------------------------------|-------------------------|
| 2 | 2/1999 | WITTIG denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Western Resources |
| 3 | 2/18/1999 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Western Resources |

| Count | On or About Date | Circumvention, Failure of Implementation or Falsification | Book, Record or Account |
|---|---|---|---|
| 4 | 3/13/2000 | WITTIG denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Western Resources |
| 5 | 3/20/2000 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Western Resources |
| 6 | 3/20/2000 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Protection One |
| 7 | 1/2001 | WITTIG denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Western Resources |
| 8 | 1/23/2001 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Western Resources |
| 9 | 11/2001 | WITTIG circumvented internal audit function by prohibiting internal auditor from auditing use of corporate aircraft | Internal audit records pertaining to use of corporate aircraft. |
| 10 | 3/2002 | WITTIG circumvented internal controls by failing and refusing to fill out | Director and Officer Annual Questionnaire for Westar Energy |
| 11 | 3/2002 | WITTIG circumvented internal controls by failing and refusing to fill out | Director and Officer Annual Questionnaire for Westar Industries |
| 12 | 3/2002 | WITTIG circumvented internal controls by failing and refusing to fill out | Director and Officer Annual Questionnaire for Protection One |
| 13 | 3/25/2002 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Westar Energy |
| 14 | 3/25/02 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Westar Industries |
| 15 | 3/25/02 | LAKE denied personal use of corporate aircraft | Director and Officer Annual Questionnaire for Protection One |

## WIRE FRAUD
## IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTIONS 2 & 1343

26) Paragraphs 1 through 23 are incorporated herein by reference.

27) Having devised the aforesaid scheme and artifice to defraud in the District of Kansas and elsewhere, the defendants,

**DAVID C. WITTIG and**
**DOUGLAS T. LAKE,**

for the purpose of executing the aforesaid scheme and artifice, and attempting so to do, knowingly caused to be transmitted by means of wire, radio and television communication in interstate commerce, in Kansas and elsewhere, certain signs, signals, pictures and sounds, to wit: interstate telephone communications as follows:

| Count | On or about Date | Transmission |
|-------|------------------|--------------|
| 16 | 5/11/2000 | 2000 Form 14A Proxy Statement, submitted electronically to the SEC |
| 17 | 6/12/2001 | 2001 Form 14A Proxy Statement, submitted electronically to the SEC |
| 18 | 5/6/2002 | 2002 Form 14A Proxy Statement, submitted electronically to the SEC |
| 19 | 4/14/1999 | 1998 Form 10-K Annual Report, submitted electronically to the SEC |
| 20 | 3/29/2000 | 1999 Form 10-K Annual Report, submitted electronically to the SEC |
| 21 | 4/2/2001 | 2000 Form 10-K Annual Report, submitted electronically to the SEC |
| 22 | 4/1/2002 | 2001 Form 10-K Annual Report, submitted electronically to the SEC |

## ENGAGING IN MONETARY TRANSACTIONS
## IN PROPERTY DERIVED FROM SPECIFIED UNLAWFUL ACTIVITY
## IN VIOLATION OF TITLE 18, UNITED STATES CODE, SECTIONS 2 & 1957

28) Paragraphs 1 through 23 are incorporated herein by reference.

29) On or about the dates set forth below, in the District of Kansas and elsewhere, the

defendants,

## DAVID C. WITTIG and
## DOUGLAS T. LAKE,

knowingly and wilfully engaged and attempted to engage in monetary transactions affecting

interstate or foreign commerce, in criminally derived property of a value greater than $10,000,

such property having been derived from the specified unlawful activity of wire fraud, in violation

of Title 18, United States Code, Section 1343, as follows:

| Count | Date | Transaction |
|---|---|---|
| 23 | 7/30/2000 | Increase in Wittig's line of credit to $3,500,000 at Capital City Bank, Topeka, secured by Western Resources stock and Split Dollar insurance. |
| 24 | 4/30/2001 | Increase in Wittig's line of credit to $5,000,000 at Capital City Bank, Topeka, secured by Western Resources stock and Split Dollar insurance. |
| 25 | 4/30/2001 | Deposit of $1,500,000 into Wittig's account at Capital City Bank from his line of credit. |
| 26 | 5/14/2001 | Increase in Wittig's line of credit to $5,500,000 at Capital City Bank, Topeka, secured by Western Resources stock and Split Dollar insurance. |
| 27 | 5/14/2001 | Deposit of $500,000 into Wittig's account at Capital City Bank from his line of credit. |
| 28 | 6/8/2001 | Loan of $500,000 from Capital City Bank, secured by Western Resources stock and Split Dollar insurance |
| 29 | 6/8/2001 | Deposit of $500,000 into Wittig's account at Capital City Bank from his line of credit. |
| 30 | 4/9/2003 | sale by WITTIG of 75,000 shares of Westar stock at $12.77 per share for $958,053 |
| 31 | 4/10/2003 | sale by WITTIG of 13,000 shares of Westar stock at $12.75 per share for $165,750 |
| 32 | 5/15/2003 | sale by WITTIG of 31,484 shares of Westar stock at $14.53 per share for $457,604 |
| 33 | 5/15/2003 | sale by LAKE of 20,000 shares of Westar stock at $14.78 per share for $295,600 |

| Count | Date | Transaction |
|-------|------|-------------|
| 34 | 5/20/2003 | sale by WITTIG of 73,605 shares of Westar stock at $14.75 per share for $1,085,673 |
| 35 | 7/30/2003 | sale by LAKE of 5,000 shares of Westar stock at $16.77 per share for $83,850 |
| 36 | 7/31/2003 | sale by LAKE of 5,000 shares of Westar stock at $16.73 per share for $83,650 |
| 37 | 1/30/2004 | sale by LAKE of 4,000 shares of Westar stock at $19.61 per share for $78,450 |
| 38 | 2/12/2004 | sale by LAKE of 5,000 shares of Westar stock at $19.46 per share for $97,298 |
| 39 | 2/13/2004 | sale by LAKE of 10,000 shares of Westar stock at $18.98 per share for $189,816 |

## Count 40

## FORFEITURE

30) The allegations of the foregoing counts of this indictment, are realleged, and by this reference fully incorporated herein, for the purpose of alleging forfeitures to the United States of America, pursuant to the provisions of Title 18 United States Code, Section 981(a)(1)(C), and 28 United States Code, Section 2461(c).

As a result of the conspiracy, scheme and money-laundering alleged in the foregoing counts,

**DAVID C. WITTIG and
DOUGLAS T. LAKE**

shall forfeit to the United States all property, real and personal, involved in and derived from the aforesaid offenses and all property traceable to such property, or proceeds, including, but not limited to:

A) all base pay, in cash and stock; all Dental/Health/Life/LTD/Vision Flex Credits; car

allowance; Legal/Financial/Tax Planning; Discretionary Accounts; Split Dollar Life insurance policies, imputed income and payout; short term incentive; long term incentive; all bonuses including for real estate and moving; stock for compensation distribution; Restricted Share Award Distribution; Restricted Share Award-Deferred payout; Restricted Stock Unit Dividends - WR; Restricted Stock Unit Dividends - Guardian; and all other Western Resources, Westar, Guardian and any other stock of affiliated and subsidiary corporations.

B) The real estate known as the Landon Mansion, located at 521 Westchester Road, Topeka, Kansas 66604, the legal description of which is found in Attachment "A" to this Indictment, incorporated herein by reference.

i) $1,974,289.20 in art and interior furnishings as more particularly described in Attachment "B" to this Indictment, incorporated herein by reference.

C) A 2001 FERRARI, 550 Maranello, VIN ZFFZS49A010122784, purchased for $229,751.00.

D) All unpaid compensation, contract rights and benefits whatsoever granted under the terms of WITTIG and LAKE's employment, employment agreements, Articles of Incorporation or Bylaws of the Company, including but not limited to change in control benefits, relocation benefits, and payment of legal fees and expenses, and indemnification and advancement of attorneys fees, as well as any escrow accounts containing the proceeds of the foregoing.

E) Any arbitration award granted to WITTIG and LAKE, jointly or individually, arising out of their employment at Westar and any subsidiary or affiliate company.

F) In the event any of the foregoing property: i) cannot be located upon the exercise of due diligence; ii) be transferred, sold to, or deposited with, a third party; iii) be placed beyond the

jurisdiction of the Court; iv) be substantially diminished in value; or, v) be commingled with other property which cannot be divided without difficulty, as a result of any act or omission of either defendant, the Court shall order the forfeiture of any other property of the defendants, up of the value of the property described in i) through v).

A TRUE BILL.

_____
FOREMAN OF THE GRAND JURY

7-14-04
DATE

_____
ASSISTANT UNITED STATES ATTORNEY
District of Kansas

[It is requested that trial be held in Topeka, Kansas]

The Court acknowledges the receipt of this indictment in open court.

_____
UNITED STATES DISTRICT JUDGE

# SHAWNEE COUNTY Appraiser

J. Mark Hixon, CKA, RMA

KANSAS



Property Comparables | Sales | Land Data and Dwelling Info | Specials | Property Tax

**Parcel ID: 0982703030101012000**

| Field | Value |
|---|---|
| Owner Name: | WITTIG DAVID C & BETH G |
| Owner Address: | 521 SWWESTCHESTER RD TOPEKA 66606 |
| Property Address: | 521 SW WESTCHESTER RD TOPEKA 66606 |
| Subdivision: | PROSPECT HILLS ADDITION |
| Zoning: | For zoning information call 785-368-3728 |
| NeighborHood: | PROSPECT HILLS |

Legal Description: WESTCHESTER RD BLK 7 40 AC M/L WITH EASEMENT OVER 3 AC BY KANS HWY COMM CASE 74060 40 AC M/L PROSPECT HILLS ADD LESS 13.84 AC PLATTED AS PROSPECT HILLS NO 2 ALSO LESS 12.28 AC PLATTED AS PROSPECT HILLS #5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | **NBHD Code:** 1580 | **Census Tract:** West Topeka | |
| **Deed Book:** 3220 | **Page:** 532 | | | | | **Recorded Date:** 05/07/1998 | |
| **Section:** 27 | **Township:** 11 | | | | | **Range:** 15 | |
| **Block:** 7 | **Lot:** | | | | | **Tax Unit:** 001 | |
| **Class:** | RU | | | | | | |
| **Land :** | 146,940 | | | | | | |
| **Improvement :** | 1,714,360 | | | | | | |
| **2003 Appraised Value by Class:** | 1,861,300 | | | | | | |
| **2003 Total Appraised Value:** | 1,861,300 | **Total Assessed Value:** | | | 214,050 | | |
| **2002 Total Appraised Value:** | 1,861,300 | **Property Value Change:** | | | 0.00% NO CHANGE | | |

United States v. Wittig, et al.
558
Case No. 02-40140-JAR

**Fine Arts Landon House Additions**

| DESCRIPTION | AMOUNT |
|---|---|
| | $1,200.00 |
| 1- bronze alligator | 1,600.00 |
| 2- auction purchases | 15,000.00 |
| 3- pool table | 7,800.00 |
| 4- consoles | 950.00 |
| 5- auction purchases | 3,200.00 |
| 6- mirror | 27,800.00 |
| 7a- carpet | 9,500.00 |
| 7- mirror | 2,125.00 |
| 11- wing chair | 39,390.75 |
| 12- carpeting | 76,220.00 |
| 13a- carpeting | 9,604.00 |
| 15a- fabric | 2,304.00 |
| 16a- upholstery | 6,080.00 |
| 17- fabric | 1,750.00 |
| 18a- fabric | 4,680.00 |
| 19a- fabric | 5,043.50 |
| 20- fabric | 2,729.50 |
| 21- fabric | 7,426.00 |
| 22- fabric | 33,850.00 |
| 23- carpet | 6,387.00 |
| 24- area rug | 38,835.00 |
| 25- carpet | 12,500.00 |
| 27- arm chair | 20,000.00 |
| 28- desk | 6,500.00 |
| 29- frame | 6,120.00 |
| 30- armoire | 17,000.00 |
| 31- sconces | 11,500.00 |
| 32- sconces | 5,200.00 |
| 33- billiard light | 1,815.00 |
| 34- auction purchases | 19,137.40 |
| 35- chairs | 7,000.00 |
| 36- urns | 16,500.00 |
| 37- bed | 18,300.00 |
| 38- linen press | 3,520.00 |
| 40- sconces | 967.50 |
| 41- mirrors | 3,420.00 |
| 42- sconces | 13,995.00 |
| 43- leather for chairs | 1,152.13 |
| 43a- leather for chairs | 1,890.23 |
| 45- auction purchases | 27,500.00 |
| 48a- dining room table | 29,720.00 |
| 51- carpet | 19,200.00 |
| 52- dining room chairs | 9,480.00 |
| 53- pot rack | 13,470.00 |
| 54- bedroom furniture | |

B

| | |
|---|---:|
| | 6,670.00 |
| 55- armoire | 2,925.00 |
| 56- sconces | 15,304.00 |
| 57- carpet rods | 4,300.00 |
| 58- lamps | 3,600.00 |
| 59- lamps | 8,970.00 |
| 60- light fixtures | 300.00 |
| 60a- light fixtures | 1,000.00 |
| 61- lamp bases | 1,780.00 |
| 62- armoire addition | 3,200.00 |
| 63- bedside table | 1,805.00 |
| 64- fixtures | 111,462.50 |
| 66- window treatment | 13,585.00 |
| 66a- window treatment | 77,875.00 |
| 67- upholstery | 2,500.00 |
| 67- addendum- table | 7,500.00 |
| 68- trolley | 2,250.00 |
| 69- frame | 5,130.00 |
| 70- sconces | 894.00 |
| 71- sconces | 759.80 |
| 72- sconces | 1,858.00 |
| 73- sconces | 1,560.00 |
| 74- lamps | 3,375.00 |
| 75- sconces | 1,185.00 |
| 76- sconces | 1,101.00 |
| 77- fabric | 1,200.00 |
| 78- fabric | 688.75 |
| 79- fixtures | 10,000.00 |
| 80- auction purchases | 16,000.00 |
| 82- tables | 2,760.00 |
| 83- bar stools | 1,520.00 |
| 84- fabric | 23,987.75 |
| 85- furniture | 6,455.00 |
| 86- mirrors | 1,890.00 |
| 89- sconces | 450.00 |
| 91- silver frame | 11,000.00 |
| 91a- lanterns | 1,920.00 |
| 92- sconces | 3,340.00 |
| 93a- lamps | 98.00 |
| 94- lamps | 750.00 |
| 95- ceiling fans | 414.00 |
| 96- sconces | 2,100.00 |
| 97- lamp | 9,500.00 |
| 99- porcelain | 2,146.00 |
| 100- fabric | 1,840.00 |
| 101- fabric | 858.00 |
| 102- fabric | 630.00 |
| 103- fabric | 228.00 |
| 104- fabric | 5,475.00 |
| 105- frames | 483.75 |
| 106- mirror | 494.00 |
| 107- fixture | 379.90 |
| 108- lamps | 450.00 |
| 109- fixture | 1,350.00 |
| 110- fixtures | 662.50 |
| 111- fixtures | 360.00 |
| 112- light | 26,499.00 |
| 114- carpeting | 1,732.00 |
| 114 addendum- carpeting | |

| Item | Amount |
|---|---|
| 115- fabric | 349.00 |
| 117- fixtures | 1,487.70 |
| 118- auction purchase | 5,980.00 |
| 119- pillows | 2,000.00 |
| 120- bench | 5,870.00 |
| 121- fireplace set | 3,000.00 |
| 124- furniture | 13,970.00 |
| 125- bench | 5,450.00 |
| 126- chandeliers | 3,600.00 |
| 127- bench | 1,800.00 |
| 128- shades | 80.00 |
| 129- fabric | 1,564.00 |
| 130- frames | 7,765.00 |
| 131- banquette | 1,690.00 |
| 132- fabric | 7,225.00 |
| 135- fabric | 503.16 |
| 138- chandelier | 1,500.00 |
| 139- fabric | 700.00 |
| 140- fabric | 2,409.45 |
| 142- frames | 2,350.00 |
| 143a- blinds | 8,492.50 |
| 145- frames | 14,000.00 |
| 147- fabric | 441.00 |
| 148a- fabric | 165.00 |
| 151a- blinds | 2,881.50 |
| 154- fabric | 6,628.20 |
| 158- table | 300.00 |
| 162- fabric | 742.50 |
| 163- record mounts | 580.00 |
| 165- shades | 1,400.00 |
| 167- table | 550.00 |
| 169- tables | 230.00 |
| 172- shades | 346.50 |
| 173- shades | 300.00 |
| 174- table top | 260.00 |
| 176- fixture | 260.00 |
| 178- light | 265.00 |
| 179- gold leaf | 2,500.00 |
| 180- cushion | 170.00 |
| 181- glass shades | 135.00 |
| 182- frames | 2,080.00 |
| 183- shade | 300.00 |
| 184- plate stands | 102.00 |
| 185- furnishings | 4,860.00 |
| 186- lantern | 2,700.00 |
| 187b- fabric | 4,830.50 |
| 188- fabric | 650.00 |
| 189- fabric | 238.00 |
| 190- light covers | 225.00 |
| 191- shade | 150.00 |
| 192- chairs | 1,500.00 |
| 193- frame | 3,001.00 |
| 195- window treatment | 2,850.00 |
| 197- table pad | 675.00 |
| 198- picture lights | 6,800.00 |
| 199- mattress covers | 1,425.00 |
| 200- cushions | 600.00 |
| 201- mirror | 952.50 |
| 202- towel stand | 1,513.50 |

| | |
|---|---:|
| | 1,650.00 |
| | 125.00 |
| 204- sconces | 1,702.00 |
| 205- lamp | 1,500.00 |
| 206- shades | 7,200.00 |
| 207- fabric | 8,500.00 |
| 208- fire screen | 1,825.00 |
| 209- chairs | 4,300.00 |
| 210- chair | 95.00 |
| 211- vases | 2,800.00 |
| 211- table top | 3,740.00 |
| 212- bench | 2,625.00 |
| 213- chairs | 290.00 |
| 214- pillows | 3,475.00 |
| 215- mirror | 95.00 |
| 216- trays | 1,099.00 |
| 217- table top | 2,303.00 |
| 218- frames | 2,800.00 |
| 219- furnishings | 240.00 |
| 220- shield | 136.00 |
| 223- tassels | 6,900.00 |
| 224- fabric | 671.00 |
| 226- candelabra | 150.00 |
| 234- fabric | 520.00 |
| 235- shades | 625.00 |
| 236- shades | 282,535.59 |
| 238- wall mount | 59,751.69 |
| Audio visual | 5,850.00 |
| Appliances | 17,970.00 |
| Alupast shutters | 16,186.67 |
| Dan Armstrong- cabinet | |
| Fitness Equipment | |
| **TOTAL** | **$1,974,289.20** |